IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **SHERONE DENISE YORK,** | * | |
| | * | |
| Plaintiff, | * | Civil Action No. 12-00023-B |
| | * | |
| vs. | * | |
| | * | |
| **CAROLYN W. COLVIN,**[1] | * | |
| **Commissioner of Social Security,** | * | |
| | * | |
| Defendant. | * | |

## ORDER

Plaintiff, Sherone Denise York (hereinafter "Plaintiff"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.*  On October 12, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 17).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

### I.     Procedural History

Plaintiff protectively filed an application for disability insurance benefits on June 3, 2008. (Tr. 172).  She also filed an application for supplemental security income benefits on June 19,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2008.  (Id. at 151).  Plaintiff alleges that she has been disabled since June 18, 2007,[2] due to her left arm amputation, phantom pain, and blood clots in her legs.  (Id. at 73, 176).  Plaintiff also claims that she suffers from depression, hypertension, and obesity.  (Id. at 425, 427-28, 431). Plaintiff's applications were denied initially, and she timely filed a Request for Hearing.  (Id. at. 33).  On November 20, 2009, Plaintiff's first administrative hearing was suspended so that the ALJ could obtain additional medical records and Plaintiff could retain an attorney.  (Id. at 68). On July 15, 2010, Plaintiff and her attorney attended a second administrative hearing before Administrative Law Judge Joseph F. Dent (hereinafter "ALJ").  (Id. at 409).  A vocational expert ("VE") also appeared at the hearing and provided testimony.  (Id. at 440).  On August 11, 2010, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 23). Plaintiff's request for review was denied by the Appeals Council on November 23, 2011.  (Id. at 1).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

II.   **Issues on Appeal**

    A.   Whether the ALJ erred in failing to evaluate Plaintiff's obesity in accordance with Social Security Ruling ("SSR") 02-1p?

    B.   Whether the ALJ erred in rejecting Plaintiff's subjective complaints of pain?

III.  **Factual Background**

Plaintiff was born on July 30, 1974, and was thirty-five years of age at the time of the

---

[2] Plaintiff previously submitted applications for disability insurance benefits and supplemental security income in July 2007. (Tr. at 23, 172-73).  Those applications were denied on January 15, 2008, and Plaintiff did not appeal the decisions, rendering them final.  (Id.).  The ALJ found that any alleged disability from June 18, 2007 through January 15, 2008, is precluded by *res judicata*.  (Id. at 23).  Plaintiff does not challenge that finding.

second administrative hearing. (Tr. at 414). Plaintiff testified that she completed high school and worked for approximately ten years as a stocker at Wal-Mart until she was injured in a motor vehicle accident on June 18, 2007. (Id. at 414-16). The accident resulted in the amputation of Plaintiff's left (non-dominant) arm, and while hospitalized, she suffered blood clots in her legs. (Id. at 176, 281). Plaintiff maintains that she cannot return to work now because of the amputation of her left arm, phantom pain, hypertension, depression, and obesity. (Id. at 176, 423-29, 431; Doc. 14 at 3-4, 6).

At the administrative hearing conducted on July 15, 2010, Plaintiff testified that she experiences burning and aching in her left arm that she estimated (on an ascending pain scale of one to ten) as being an eight out of ten without medication and a six or seven with medication. (Id. at 424). She testified that the pain in her arm "goes and comes." (Id.). In addition, Plaintiff testified that she has hypertension which is controlled with medication, and that her hypertension causes her to experience headaches two or three times a week that last for about thirty minutes at a time. (Id. at 425, 433). According to Plaintiff, she is five feet, three inches tall and weighs two hundred ninety pounds. (Id. at 427-28). Plaintiff indicated that she has problems with her ankles swelling and with sitting,[3] standing, walking, reaching, and lifting.[4] (Id. at 422, 424, 426-28). Plaintiff also testified that, as a result of her amputation, she can no longer tie shoes, button clothing, bathe under her arms, comb her hair, pick up her children, sweep, or open jars. (Id. at 418-19, 421-23).

---

[3] Plaintiff testified that she is only able to sit for forty-five minutes, stand for forty minutes, and walk for fifteen minutes. (Tr. at 426-27).

[4] Plaintiff testified that she cannot lift her twenty-seven pound baby, but she can lift a gallon of milk. (Tr. at 422-23).

Plaintiff further testified that she is the primary caregiver for her four children, ages eleven, four, three, and one. (Id. at 417). In addition, Plaintiff indicated that she is able to shower and "put on [her] clothes,"[5] prepare simple meals, dust, use a vacuum, fold some clothes, change diapers, and with daily help from near-by relatives, she is able to dress and bathe her children. (Id. at 185-88, 418-19, 421-23). Plaintiff also reported that she drives, shops, attends church, goes to doctor's appointments, and gets her medication refilled.[6] (Id. at 188-89, 421-22, 428).

Plaintiff has had no vocational rehabilitation, therapy, or training since leaving the hospital following her accident in 2007. (Id. at 430-31). She testified that she takes medication for depression and pain, and that the pain mediation makes her sleepy. (Id. at 419-20, 431).

## IV. Analysis

### A. Standard Of Review

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[7] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh

---

[5] Plaintiff testified that she needs help putting on certain clothing. (Tr. at 418).

[6] Plaintiff stated in her Function Report dated August 4, 2008, that she gets up in the morning and "put[s] on [her] clothes, help[s] prepare[] breakfast for [her] children[,] help[s] feed them[,] put[s] on their clothes[,] play[s] a little while[,] do[es] some household chores[,] help[s] prepare[] lunch for them[,] [and] rest[s]." (Tr. at 185). She also stated that she takes care of her four children, including changing their diapers, helping prepare their meals, and helping with their baths, that she is able to dust, fold some clothes, and sweep, and that she maintains a bank account and is able to pay her bills and handle her finances. (Id. at 186-188).

[7] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B.    Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.[8] 20 C.F.R.

---

[8] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following

§§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since June 18, 2007, and that she has the severe impairments of amputation of left upper extremity, major depressive disorder (mild), hypertension (benign), and morbid obesity.[9] (Tr. at 25). The ALJ also determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 26).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform less than the full range of sedentary work. (Id. at 27). Specifically, the ALJ found that Plaintiff is limited to sedentary work which will allow her to alternate between sitting and standing positions every thirty to sixty minutes throughout the day while remaining at her work-station. (Id.). He also found that Plaintiff cannot push, pull, reach, handle, or finger with her left upper extremity, which is not her dominant upper extremity, and that she cannot crawl, climb ladders, ropes, or scaffolds. (Id.). Additionally, he determined that Plaintiff can

---

four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[9] The ALJ also found that Plaintiff had the non-severe impairment of deep venous thrombosis ("DVT"), which was non-severe because Plaintiff only had this condition while she was in the hospital recovering from the motor vehicle accident, and it did not last more than twelve consecutive months. (Tr. at 26).

occasionally balance, stoop, kneel, crouch, and climb ramps and stairs, and that she can frequently reach overhead with her right upper extremity, her dominant upper extremity. (Id.). He also found that Plaintiff should avoid all exposure to hazardous machinery and unprotected heights, and that she is limited to performing simple, routine, and repetitive one and two step tasks in a low stress job involving only occasional decision making and only occasional changes in the work setting. (Id.). The ALJ determined that while Plaintiff's left arm amputation has caused an "obvious limitation," her statements concerning the intensity, persistence, and limiting effects of the pain and other symptoms caused by her impairments are "only marginally credible." (Id. at 28, 30-31).

Utilizing the services of a VE, the ALJ determined that Plaintiff is not capable of performing her past relevant work (hereinafter "PRW") as a stock clerk, which is a heavy, semi-skilled occupation. (Id. at 31). However, considering Plaintiff's RFC and vocational factors such as age, education, and work experience, in conjunction with the Medical-Vocational Guidelines and the VE's testimony, the ALJ determined that Plaintiff is able to perform other jobs existing in significant numbers in the national economy such as stringing machine tender, and napper tender, both of which are sedentary, unskilled occupations. (Id. at 31-32). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

### 1. Medical Evidence

The relevant evidence of record reflects that on June 18, 2007, Plaintiff was admitted to Vaughn Regional Medical Center in Selma, Alabama, for injuries sustained in an automobile accident. (Id. at 227). On that day, she was airlifted to the University of Alabama at Birmingham ("UAB") Medical Center where she underwent surgery to amputate her left arm. (Id. at 233, 304). Following surgery, Plaintiff developed deep vein thrombosis, sepsis, and

pneumonia and required intubation. (Id. at 281-83). She remained in the hospital for two and a half months and was discharged to Spain Rehabilitation Center on September 6, 2007. (Id. at 284). At the time of her transfer to the rehabilitation center, Plaintiff was breathing well, healing well, on no antibiotics, eating a regular diet, ambulating with some assistance,[10] and her pain was "well controlled." (Id. at 284, 350).

At Spain Rehabilitation Center, Plaintiff received physical therapy for two weeks and "performed well," "with the exception of having decreased balance which occurred infrequently." (Id. at 276). She also "performed well" in occupational therapy, "with the exception of occasional decreased endurance and strength." (Id.). Plaintiff "had no significant complications during her uneventful stay at Spain Rehab" and was discharged on September 18, 2007. (Id.).

On October 3, 2007, Plaintiff saw Dr. Anthony Pitts for a follow up examination. Dr. Pitts noted that Plaintiff had "good control" over her pain with Lortab and Neurontin and that her hypertension and glucose intolerance were being medically managed as well. (Id. at 276). Following a neuropsychological evaluation, Dr. Pitts recommended that Plaintiff continue Lexapro because of her "flat affect, limited energy, and grief over the recent death of her mother." (Id.). Dr. Pitts concluded that Plaintiff was "coping adequately" and had "strong family support." (Id.). He instructed Plaintiff to continue her follow up care and to call her primary care physician with any other medical problems. (Id. at 277).

On November 28, 2007, Plaintiff returned for a follow up examination and was examined by Dr. Thomas Matthews. He noted that Plaintiff was "[d]oing very well with no complaints"

---

[10] Dr. Anthony Pitts noted that, at the time of her transfer to the rehabilitation center, Plaintiff had an unsteady gait and would easily lose her balance. (Tr. at 350).

and "ambulating without difficulty." (Id. at 274). Dr. Matthews did note that Plaintiff was experiencing phantom pain in her left arm, which she rated as a six out of ten on an ascending pain scale, with ten being the worst possible pain. (Id. at 274, 310). Plaintiff reported that her pain was "improved by medications," and that she had not refilled her medications (which included Lasix, Lortab, Neurontin, Lopressor, and Lexapro) for about a month. (Id. at 274). Dr. Matthews noted, "[s]he reports she has not taken any of these for about a month - apparently she ran out of meds and did not seek refills." (Id.). He concluded, "Ms. York is doing very well after her long complicated ICU stay. She has no complaints today." (Id.). He continued her prescriptions for Lortab, Neurontin, and Lexapro and referred her to the Russell Clinic for management of her hypertension. (Id. at 275).

On December 4, 2007, Plaintiff was examined by Dr. Aaron Sweeney who noted that Plaintiff complained of "phantom arm pain which she describe[d] as a 5/10 in severity but [she] has responded well to Neurontin therapy." (Id. at 344). Dr. Sweeney further noted, "[s]he also complains of pain in the area of skin graft located in the left thigh that hurts when she sleeps on it. No other issues per the patient." (Id.). Dr. Sweeney continued Plaintiff's medication therapy for pain and for hypertension and encouraged her to lose weight. (Id. at 345).

On December 19, 2007, Plaintiff had a follow up visit and was seen by Dr. Samuel Windham who noted that she was "still having phantom pain, but otherwise progressing appropriately without any symptom of complication or other problems." (Id. at 273). He noted that she appeared to be "slight[ly] depressed" and was seeing Dr. Aaron Sweeney for her primary care from that point forward. (Id.).

Plaintiff saw Dr. Sweeney on February 18, 2008, and complained of phantom arm pain which had not worsened but had not gotten any better. (Id. at 341). Plaintiff reported that she

9

had stopped taking Lortab but had to restart it, and that she was taking it twice daily. (Id.). Plaintiff described the pain as "alternating between dull and sharp" and occasionally of a "burning quality." (Id.). Dr. Sweeney noted that Plaintiff was in no acute distress, that she had gained twenty-five pounds in two months, and that she appeared to be depressed, although she denied symptoms of depression. (Id.).

On April 22, 2008, Plaintiff returned to Dr. Sweeney for a follow up examination and reported that her phantom arm pain was more manageable. (Id. at 339). Plaintiff also reported that she did not wish to have her medications adjusted. Dr. Sweeney noted that "she feels she is able to tolerate the pain." (Id.). Plaintiff reported that she stays physically active by playing with her children at night. (Id.). Dr. Sweeney noted that Plaintiff was in no acute distress, that her blood pressure was better, and that she had no lower extremity swelling; however, she had considerable weight gain since the last visit. (Id. at 339-40). Her examination in all other respects was normal. (Id. at 339). Dr. Sweeney encouraged her to increase her physical activity. (Id. at 340).

On June 3, 2008, Plaintiff filed her current application for disability benefits. (Id. at 172). On August 12, 2008, State Agency physician Dr. Robert Heilpern reviewed Plaintiff's medical records in connection with her disability application, and he completed a Physical Residual Functional Capacity Assessment. He concluded that as a result of her amputation, she had no manipulative functioning (reaching, handling, fingering, feeling) with respect to her left upper extremity. (Id. at 385). He also concluded that Plaintiff could stand, walk, and sit for six hours each in an eight-hour workday, could occasionally lift/carry twenty pounds, could frequently lift/carry ten pounds, could frequently climb stairs, balance, stoop, kneel, and crouch, but could never climb a ladder or crawl. (Id. at 382-84). He further found that Plaintiff was not limited

with respect to visual, communicative, and environmental limitations, except that she should avoid exposure to hazardous machinery and heights. (Id. at 385-86). Dr. Heilpern noted that Plaintiff "has difficulty with all activities as a result of the loss of her [left upper extremity]." (Id. at 387). He explained further, "[s]he does "chores, etc. but it takes longer." (Id.).

On that same date, August 12, 2008, State Agency physician Dr. Robert Estock, completed a Psychiatric Review Technique related to Plaintiff's diagnosis of depression. (Id. at 368, 371). Dr. Estock concluded that Plaintiff was only "mildly" limited by her depression. (Id. at 378).

The medical records indicate that after Plaintiff saw Dr. Sweeney on April 22, 2008, she did not seek medical treatment from any physician for any reason for approximately seventeen months. (Id. at 339). On September 15, 2009, almost a year and a half after her previous visit, Plaintiff returned to Dr. Sweeney for a follow up visit and medication refills. (Id. at 397). Plaintiff reported that she was having burning sensations related to her left arm very similar to her prior pain. (Id.). Dr. Sweeny noted that "she has not been taking any of her medications due to running out, and notably her [blood pressure] is quite high today." (Id.). He also noted that she was in no acute distress, that her gait was normal, and that her physical examination otherwise was normal. (Id.). He continued her medication regimen of Chlorthalidone, Benazepril, Amitriptyline, and Gabapentin.[11] (Id. at 398).

On December 4, 2009, Plaintiff returned to Dr. Sweeney for a "hypertension follow-up."

---

[11] Chlorthalidone and Benazepril are medications used to treat high blood pressure. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682342.html; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692011.html. Amitriptyline is class of medications called tricyclic antidepressants and is used to treat the symptoms of depression. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html. Gabapentin is a medication used to relieve pain. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.

Dr. Sweeney noted that Plaintiff's blood pressure was "reasonably well controlled." (Id. at 400). Plaintiff reported phantom arm pain, and Dr. Sweeney increased her dosage of Amitriptyline and Gabapentin. (Id.). Dr. Sweeney noted that Plaintiff was in no acute distress, that her gait was normal, and that her physical examination was otherwise normal. (Id.). Plaintiff returned on January 19, 2010, for a routine follow up and medication refill and was seen by Dr. Stephen Russell, who continued her regular course of treatment. (Id. at 406).

On February 16, 2010, the Agency referred Plaintiff to Dr. Richard S. Reynolds, Ph.D., for a consultative psychological examination. (Id. at 391-93). Plaintiff reported to Dr. Reynolds that she had no past psychiatric treatment but that her mother had passed away in 2007, causing her to experience "tearfulness, constant worry, low mood, low energy, sleep disturbance, sadness, and diminished interest." (Id. at 391). Dr. Reynolds noted that Plaintiff came to the visit "unassisted", and that she described her daily activities as waking at 6:30 a.m., going to bed between 10:00 and 11:00 p.m., sharing the housework, cooking, and grocery shopping with relatives, managing her own finances, driving, watching TV, and reading. (Id. at 392). She also reported having friends and going to church. (Id.). Dr. Reynolds found Plaintiff to be alert, oriented, and cooperative, with no psychotic intrusions, no homicidal ideation, and no suicidal ideation. (Id.). He noted that although her affect was sad, her memory, judgment, insight, and decision making abilities were intact, and her thought content and associations were logical and tight. (Id.). Dr. Reynolds diagnosed Plaintiff with "major depression, mild to moderate." (Id. at 391). He opined that Plaintiff's ability to understand, carry out, and remember instructions and respond appropriately to supervision, co-workers, and work pressure "may be somewhat impaired" by her "mild" depression. (Id. at 393-94). He further explained in his Medical Source Statement (Mental) that Plaintiff had no limitation whatsoever with respect to understanding,

remembering, and carrying out simple instructions and only mild limitations with respect to complex instructions. (Id. at 394). He noted that Plaintiff would need no assistance with any funds awarded by Social Security. (Id.).

### 2. Issues

      **a. Whether the ALJ erred in failing to evaluate Plaintiff's obesity in accordance with Social Security Ruling ("SSR") 02-1p?**

In her brief, Plaintiff claims that the ALJ erred in this case by "fail[ing] to comply with SSR 02-1p." (Doc. 14 at 6). Plaintiff essentially argues that, while the ALJ found her morbid obesity to be a severe impairment, he failed to consider the impact of her obesity on her ability to work when formulating her RFC. Plaintiff is correct that "[a]n ALJ must consider obesity as an impairment when evaluating disability." Sanders v. Astrue, 2011 U.S. Dist. LEXIS 125033, *8-9, 2011 WL 5118808, *3 (M.D. Ala. October 28, 2011) (citing SSR 02-1p)[12] ("'[W]e consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability.'"). However, "while the ALJ has the responsibility to make a determination on Plaintiff's RFC, it is Plaintiff who bears the burden of proving her RFC, *i.e.*, Plaintiff must establish that her obesity results in functional limitations and that she was 'disabled' under the Social Security Act." Sanders, 2011 U.S. Dist. LEXIS 125033 at *9 (citing

---

[12] SSR 02-1p provides, in part, that "[o]besity can cause limitation of function," in areas such as "sitting, standing, walking, lifting, carrying, pushing, . . . pulling, . . . climbing, balance, stooping, . . . crouching[,] ability to manipulate . . . the hands and fingers[,] [and] ability to tolerate extreme heat, humidity, or hazards. . . ." 2002 SSR LEXIS 1, *16, 2002 WL 34686281, *6. This ruling directs the ALJ to assess "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment" "on a regular and continuing basis" and explain how he reached his conclusions on whether obesity caused any physical or mental limitations. 2002 SSR LEXIS 1 at *16-18.

20 C.F.R. § 404.1512(a) & (c) (2011) (claimant must provide medical evidence showing that she has an impairment and how severe it is during the time that she says that she is disabled).

In the present case, the ALJ found Plaintiff's obesity to be a severe impairment, and although he did not specifically reference SSR 02-1p or discuss the degree to which he attributed any additional limitation to Plaintiff due to her obesity, there is no question that he considered Plaintiff's obesity in his disability determination, as he repeatedly referenced her weight when setting forth the bases for his determination that she was not disabled.  (Id. at 25-29).  Indeed, the ALJ referred to Plaintiff's obesity or weight no less than six times in his decision.  (Id.).  He ultimately concluded, however, that the medical evidence did not support a finding that her obesity (alone or in combination with any other impairment) resulted in a disabling medical condition.

Based upon a careful review of the record, the Court agrees with the ALJ that Plaintiff has not established that her obesity caused significant limitations on her ability to work.  Indeed, the record is devoid of any such evidence.  Therefore, the Court finds that the ALJ properly considered the issue of Plaintiff's obesity in making his disability determination and that the medical evidence does not support a finding that Plaintiff's obesity resulted in functional limitations that prevent her from performing a reduced range of sedentary work.  See Gary v. Astrue, 2009 U.S. Dist. LEXIS 87046, *7-8, 2009 WL 3063318, *3 (M.D. Ala. Sept. 22, 2009) (ALJ's failure to mention obesity or explain whether claimant's obesity caused any physical or mental limitations did not provide basis for relief where the claimant identified no evidence in the record to support her position that the condition caused significant limitations on her ability to work); Vickers v. Astrue, 2009 U.S. Dist. LEXIS 128327, *42-43, 2009 WL 722273, *14 (N.D. Fla. Feb. 6, 2009), adopted by 2009 U.S. Dist. LEXIS 21704 (N.D. Fla. March 18, 2009)

(remand for failure to mention obesity is not required where the claimant does not show how his obesity impaired his ability to work). Therefore, Plaintiff's claim is without merit.

In addition to the Court's finding that the ALJ did not err in his consideration of Plaintiff's obesity, the Court further finds that the substantial evidence in this case supports the ALJ's RFC assessment that Plaintiff can perform a range of sedentary work. (Id. at 27). As discussed above, Plaintiff's medical records show that by September 18, 2007, her amputation site had healed well, and she had successfully completed her rehabilitation at the Spain Rehabilitation Center. (Id. at 276, 279). Her treating physician, Dr. Pitts, noted that she "performed well" in physical and occupational therapy and "had no significant complications during her uneventful stay" at the rehabilitation center. (Id. at 276). In the months and years following her discharge, Plaintiff's treating physicians consistently documented that she was "doing very well," that she ambulated without difficultly, that her gait was normal, and that she had "good control" over her pain.[13] (Id. at 274, 276, 339, 344, 397, 400). Her treatment records reflect that she actually went months (even as long as a year and a half) without pain medication and without seeing a physician. (Id. at 274, 397). Plaintiff's treatment records further reflect that she had only mild to moderate depression[14] and that her high blood pressure was

---

[13] In April 2008, Plaintiff reported to Dr. Sweeney that she did not need to have her pain medications adjusted because she could tolerate the pain. (Tr. at 339).

[14] Consultative psychologist, Dr. Reynolds, found Plaintiff's depression to be no more than "mild to moderate" and, in a separate Medical Source Statement (Mental) form, noted that Plaintiff had no limitations with respect to understanding, remembering, carrying out, and making judgments related to simple instructions and only mild limitations related to complex instructions. (Id. at 391, 394). He opined that Plaintiff's ability to understand, carry out, and remember instructions and respond appropriately to supervision, co-workers and work pressure "*may* be *somewhat* impaired.*" (Tr. at 393) (emphasis added). Likewise, State Agency psychiatrist, Dr. Estock, completed a Psychiatric Review Technique and concluded that Plaintiff was only "mildly" limited by her depression. (Id. at 378). Plaintiff also testified at her first administrative hearing

"reasonably well controlled" with medication. (Id. at 273, 378, 394, 400). This evidence supports the ALJ's determination that Plaintiff could perform a reduced range of sedentary work.

Moreover, State Agency physician, Dr. Heilpern, found in his Physical RFC Assessment that despite the complete loss of use of Plaintiff's left (non-dominant) arm, which also precluded her from crawling, climbing a ladder, rope, or scaffold, or working around hazardous machinery and heights, Plaintiff could still stand, walk, and sit for six hours each in an eight-hour workday, occasionally lift/carry twenty pounds with her right upper extremity, frequently lift/carry ten pounds, and frequently climb stairs, balance, stoop, kneel, and crouch. (Id. at 382, 384-86). Dr. Heilpern further opined that Plaintiff had no limitations with respect to visual, communicative, and environmental functioning. (Id. at 385-86). This evidence further supports the ALJ's determination that Plaintiff could perform a reduced range of sedentary work.[15]

In addition, Plaintiff's own accounts of her activities of daily living reflect that she lives alone with her four children, ages eleven, four, three, and one and that she is their primary caregiver. (Id. at 185, 417-19). Although there are tasks that she can no longer perform without assistance (*i.e.*, tie shoes, button clothing, pick up her children, put on certain items of clothing, comb her hair, sweep, or open jars), she can take a shower, "put on [her] clothes," change diapers, help dress her children, help bathe her children, play with her children, prepare simple meals, do some household chores, vacuum, dust, and fold some clothes. (Id. at 185-88, 418-19, 421-23). In addition, she goes out alone, drives, shops, attends church, goes to doctor's

---

on November 20, 2009, that she has never sought treatment from a psychologist or psychiatrist and that no physician has ever recommended that she do so. (Id. at 65).

[15] The ALJ's determination is further supported by the Vocational Expert's testimony that even with Plaintiff's limitations, she could do "simple machine tending" such as stringing machine tender and napper tender, both of which are sedentary and unskilled. (Tr. at 442-43).

appointments, gets her medications refilled, and takes care of her finances. (Id. at 188-89, 421-22, 428). This evidence also supports the ALJ's assessment that Plaintiff is capable of performing a reduced range of sedentary work.[16]

While the Court does not question the obvious impairment caused by Plaintiff's amputated left arm, the substantial evidence in this case supports the ALJ's RFC assessment that, despite her impairments, Plaintiff can still perform a range of sedentary work. Therefore, she is not disabled. See Chaverst v. Astrue, 2012 U.S. Dist. LEXIS 155852, *12, 2012 WL 5379063, *1 (N.D. Ala. Oct. 31, 2012) (ALJ did not err in finding that claimant had the RFC to perform simple light work despite the loss of his dominant right arm, noting that the medical evidence showed that claimant had progressed well following his surgery and generally functioned without taking prescription pain medication).

### b. Whether the ALJ erred in rejecting Plaintiff's subjective complaints of pain?

Plaintiff also claims that the ALJ erred in improperly evaluating her testimony with regard to the severity of her pain. (Doc. 14 at 9). At her hearing on July 15, 2010, Plaintiff

---

[16] The Court also rejects Plaintiff's argument that the ALJ committed reversible error by relying on the fact that she became pregnant and gave birth to her fourth child after her accident as support for his disability determination. (Doc. 14 at 11). While the ALJ did note that Plaintiff became pregnant and gave birth to her youngest child after her accident, he did so in the context of her activities of daily living, which included playing with her children and driving. (Tr. at 31). While the Court agrees with Plaintiff that the relevance of those facts is tenuous at best, the remaining substantial evidence in this case supports the ALJ's determination that Plaintiff is not disabled. Therefore, Plaintiff's argument that the ALJ's misplaced reliance on those facts constitutes reversible error is without merit. See Louis v. Commissioner of Soc. Sec., 2012 U.S. Dist. LEXIS 62497, *2-3, 2012 WL 1579337, *1 (W.D. Mich. May 4, 2012) (ALJ's comment that claimant was "capable of becoming pregnant . . . [and] providing the majority of her own care and that of her children" did not constitute reversible error inasmuch as the ALJ "did not deny Plaintiff's claim based on her decision to become pregnant but because the evidence showed that she was not disabled.").

maintained that she cannot work because she has phantom pain (a burning and aching pain) in the remainder of her left arm every single day that "goes and comes," that without medication, the pain is an eight on an ascending pain scale of one to ten, that with medication, the pain is a six or seven out of ten, that she has to take the pain medication three times a day, that the medication makes her drowsy, that her hypertension causes her to have headaches two or three times a week that last for about thirty minutes, and that she can only sit for about forty-five minutes without feeling a sharp pain down her back side. (Tr. at 420, 424-27). The ALJ found this testimony to be only marginally credible. (Id. at 30). The Court agrees.

The standard by which Plaintiff's complaints of pain are to be evaluated requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Hubbard v. Commissioner of Soc. Sec., 348 Fed. Appx. 551, 554 (11th Cir. 2009) (quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). "This standard can be satisfied by a claimant's subjective testimony if that testimony is supported by medical evidence." Id. (citing Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)). The Eleventh Circuit has also held that the determination of whether objective medical impairments could reasonably be expected to produce the pain was a factual question to be made by the Secretary and, therefore, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence." Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1985), *vacated on other grounds and reinstated sub nom.* Hand v. Bowen, 793 F.2d 275 (11th Cir. 1986). Furthermore, the Social Security regulations specifically state:

> [S]tatements about your pain or other symptoms will not alone

18

> establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 C.F.R. 404.1529(a) (2010).

As discussed above, the medical evidence of record shows, as the ALJ found, that despite Plaintiff's claims of debilitating phantom arm pain, hypertension headaches, and pain down her back side from sitting, Plaintiff has repeatedly gone months and even as long as a year and a half without taking her prescribed pain medications and high blood pressure medications or seeking medical treatment for pain or for any other condition. (Id. at 274, 397). On November 28, 2007, Plaintiff described her pain level as six out of ten in severity, and on December 4, 2007, Dr. Sweeney noted that Plaintiff was responding well to her medication therapy and that her pain level was a five out of ten in severity. (Id. at 310, 344). On April 22, 2008, Plaintiff told Dr. Sweeney that she did not need to have her pain medications adjusted because she could tolerate the pain. (Id. at 339). In addition, on December 4, 2009, Dr. Sweeney noted that Plaintiff's high blood pressure (which she testified causes her headaches two or three times a week) was "reasonably well controlled" with medication. (Id. at 400). Plaintiff's treating physicians have regularly noted that she presented in "no acute distress," that she walked with a normal gait, that she was "ambulating without difficulty," and that she was "[d]oing very well with no complaints." (Id. at 274, 339, 341, 397, 400). This evidence, particularly Plaintiff's failure to take her prescription pain medications, combined with the evidence of Plaintiff's activities of

daily living recounted above, undermines Plaintiff's credibility and her claims that her pain makes it impossible for her to work.

"[C]redibility determinations are the province of the ALJ," Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005), and a reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. Kalishek v. Commissioner of Soc. Sec., 470 Fed. Appx. 868, 871 (11th Cir. 2012). Based upon a careful review of all of the evidence in the record, the Court finds that the ALJ properly evaluated Plaintiff's credibility and clearly articulated his finding with regard to Plaintiff's pain, and the ALJ's credibility finding is supported by substantial evidence in the record. Therefore, Plaintiff's claim that the ALJ erred in evaluating his testimony with regard to the severity of her pain is without merit.

## V. Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits and supplemental security income be **AFFIRMED.**

**DONE** this **28th** day of **March, 2013.**

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**